# UNITED STATES DISTRICT COURT

# DISTRICT OF KANSAS

| | |
|---|---|
| VERMIN LOVE SUPREME, an individual;<br><br>       Plaintiff,<br><br>v.<br><br>KANSAS STATE ELECTIONS BOARD; SECRETARY OF STATE KRIS KOBACH (in his official and personal capacity); GOVERNOR JEFF COLYER (in his official and personal capacity); GOVERNOR'S CHIEF COUNSEL BRANT LAUE (in his official and personal capacity); KANSAS ATTORNEY GENERAL DEREK SCHMIDT (in his official and personal capacity); Elections Director Bryan Caskey (in his official capacity);<br><br>       Defendants. | Civil Case No. _____ |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

1.0  INTRODUCTION ...................................................................................................... 1

2.0  FACTS ...................................................................................................................... 3

3.0  STANDARDS FOR OBTAINING INJUNCTIVE RELIEF ............................................ 9

4.0  ARGUMENT ............................................................................................................ 9

4.1  *Plaintiff Has Standing* ....................................................................................... 9

4.2  *Plaintiff is Likely to Prevail on the Merits of His Claims* ............................. 11

4.2.1  K.S.A. 25-308(a), (c), and/or (e) are Unconstitutional and
Defendants Have Violated Plaintiff's Constitutional Rights .............. 11

4.2.2  Standard for Evaluating Constitutional Challenges to State
Election Laws .......................................................................................... 14

4.2.2.1  The Character and Magnitude of the Burdens ........................... 15

4.2.2.2  State Interests and Narrow Tailoring ............................................. 17

4.3  *Without Injunctive Relief, Mr. Supreme Will Continue to Suffer
Irreparable Harm* .................................................................................................... 19

5.0  CONCLUSION ....................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

## CASES

*Abilene Retail # 30, Inc. v. Six,*
    641 F. Supp. 2d 1185 (D. Kan. 2009) ............................................ 9

*Anderson v. Celebrezze,*
    460 U.S. 780, 787-88 (1983) ................................................ 10, 15

*Arizonans for Official English v. Arizona,*
    520 U.S. 43, 64 (1997) ........................................................... 9

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ......................................................... 11, 15

*California Democratic Party v. Jones,*
    530 U.S., 567, 569 (2000) ...................................................... 16

*Carey v. Piphus,*
    435 U.S. 247, 248 (1978) ...................................................... 19

*Doe v. Bolton,*
    410 U.S. 179, 188 (1973) ........................................................ 9

*Elrod v. Burns,*
    427 U.S. 347 (1976) ......................................................... 9, 20

*Gitlow v. New York,*
    268 U.S. 652 (1925) ........................................................... 11

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ........................................................... 13

*Hodes & Nauser v. Schmidt,*
    52 Kan. App. 2d 274, 368 P.3d 667 (2016) .................................... 11

*Hoffman Estates v. Flipside, Hoffman Estates,*
    455 U.S. 489 (1982) ........................................................... 14

*Ill. Bd. of Elections v. Socialist Workers Party,*
    440 U.S. 173 (1979) ........................................................... 11

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ........................................................... 10

*Lundgrin v. Claytor,*
    619 F.2d 61 (10th Cir.1980) .................................................... 9

*NAACP v. Alabama ex rel. Patterson,*
    357 U.S. 449 (1958) (Harlan, J.) ............................................... 11

*Norman v. Reed,*
    502 U.S. 279 (1992) ........................................................... 15

RANDAZZA | LEGAL GROUP

*Palko v. Connecticut,*
302 U.S. 319 (1937) (Cardozo, J.) ............................................................. 11

*Reynolds v. Sims,*
377 U.S. 533 (1964) ...................................................................................... 20

*Rutan v. Republican Party of Illinois,*
497 U.S. 62 (1990) ........................................................................................ 16

*Schaefer v. Townsend,*
215 F.3d 1031 (9th Cir. 2000) ..................................................................... 6

*Utah Republican Party v. Cox,*
885 F.3d 1219 (10th Cir. 2018) ................................................................ 11

*Wesberry v. Sanders,*
376 U.S. 1 (1964) ........................................................................................... 20

*Williams v. Rhodes,*
393 U.S. 23 (1968) ........................................................................................ 16

## STATUTES

Kansas Statutes Annotated 25-1436 .................................................... 2, 12

Kansas Statutes Annotated 25-206 ............................................................. 1

Kansas Statutes Annotated 25-308 ................................................... *passim*

## CONSTITUTIONAL PROVISIONS

Kansas Const. ................................................................................................. 8

U.S. Const. art. I ............................................................................................ 6

U.S. Const. amend. I ..................................................................................... 8

U.S. Const. amend. XIV .......................................................................... 8, 11

RANDAZZA | LEGAL GROUP

## MEMORANDUM OF POINTS AND AUTHORITIES

**1.0    INTRODUCTION**

Plaintiff Vermin Love Supreme is a political activist and public figure who has run for various elected offices since the 1980s including President of the United States.  Mr. Supreme learned that under the Kansas Constitution and, "[u]nder Kansas law, there is no law governing the qualifications for governor, not one,"[1] Mr. Supreme announced he would run as a candidate for Kansas Attorney General.

Mr. Supreme timely filed a Declaration of Intention to become a candidate, in person and in Kansas, as required by Kansas Statute Annotated ("K.S.A.") 25-206, before noon on June 1, 2018.  As part of his commentary on American politics, Mr. Supreme's political platform advocates for socialized distribution of equine companions and is known nationally for his political ambitions.[2]  Mr. Supreme expected to receive substantial backing from his Kansas supporters.

Kansas made nationwide news due to its uniquely restrictive laws for Kansas voters, while having absolutely no laws about running for office in Kansas. Mr. Supreme wished to run for Kansas Attorney General ("AG") in part to draw

---

[1]    *See* **Exhibit 1**, Hunter Woodall, "The 16-Year-Old Running for Governor of Kansas," TRIBUNE NEWS SERVICE (Aug. 8, 2017) ("***Under Kansas law, there is no law governing the qualifications for governor, not one***," said Bryan Caskey, director of elections at the Kansas secretary of state's office. "***So there's seriously nothing on the books that lays out anything, no age, no residency, no experience.  Nothing***.") (emphasis added), available at: <http://www.governing.com/topics/politics/tns-jack-bergeson-kansas-governor.html>.

[2]    Mr. Supreme's long standing platform has been centered on mandatory tooth brushing and free ponies for all.  *See* Declaration of Vermin Supreme ("Supreme Decl."), attached as **Exhibit 2**, at ¶ 3.  Although Supreme uses "joke humor" as a campaign device when he runs for office as a response to some of the issues inherent in democracy, Supreme is a sincere political activist, who has participated in protests such as the *Great Peace March for Global Nuclear Disarmament* and the *Occupy* protests. *Id.*

attention to these disparities, but also because he has a desire to serve the people of Kansas.  There are no age, residency, or experience requirements to run for Kansas Attorney General pursuant to Kansas law or the Kansas Constitution.

After Mr. Supreme filed his Declaration of Intention, the Executive Director of the Kansas Republican Party, Mr. Jim Joice, filed an objection to Mr. Supreme's candidacy, based on a non-existent "residency" requirement.  K.S.A. 25-308 states that anyone may object to any candidate and, [t]he causes for objection under this section as to any office *may be* any of those causes listed in K.S.A. 25-1436." (emphasis added).  Residency is not listed as an enumerated requirement under K.S.A. 25-1436.

The Kansas Elections Board, which is comprised of elected officials (who are also running their own election campaigns), scheduled a hearing on the Opposition for Monday, June 11, 2018.  Pursuant to the statute, the Lieutenant Governor, the Secretary of State, and the Attorney General, are the only officials authorized to vote on the objections.

As described in more detail below, the Attorney General abstained from participating in the hearing, without designating another officer to vote in his place, and the Kansas Election Board (the "Board") voted 2-0 to sustain Mr. Joice's objection, finding that Mr. Supreme was not a resident and thus was not qualified.

Directly after Mr. Supreme's hearing, the Board heard a substantially similar case, wherein a Democrat objected to a Republican's candidacy based on a residency requirement, and despite the fact that the second candidate had only recently stated an intention to move for the election on May 7, 2018, the Board arbitrarily approved that the second candidate would be allowed on the ballot.

Defendants' conduct is never constitutionally tolerable, but the harm caused by their actions is especially pronounced here.  Access to the ballot and

the ballot box is one of the bedrock principals of our democracy by the people, and the regulations, the Constitution, and the Defendant's actions must be scrutinized. Plaintiff's freedom of association rights are protected by the First Amendment, and his due process rights are protected by the Fourteenth Amendment. This will not stand, and the Court should immediately remedy the unconstitutional wrong by ordering that the Defendants to place Mr. Supreme's name on the ballot, and enjoining the Defendants from disqualifying Mr. Supreme from appearing on the ballot.

## 2.0    FACTS

Vermin Love Supreme has run for President of the United States at least four times. *See* Supreme Decl. at ¶ 1. Mr. Supreme has appeared on several state's ballots in his bid to become President, and he placed fourth in New Hampshire's Democratic primary election in 2016.[3] *See* Supreme Decl. at ¶ 2.

Part of Mr. Supreme's long standing campaign platform has centered on free ponies for all Americans and mandatory tooth-brushing laws. Supreme Decl. at ¶ 3. Some voters have interpreted this as commentary, satire, and political parody about a political system that rewards candidates who promise free benefits without discussing cost and to pass overprotective laws that interfere with individual choice.[4]

---

[3]    *See* **Exhibit 3**, Rebecca Kaplan, "Vermin Supreme finishes fourth in N.H. Democratic primaries," CBS NEWS (Feb. 10, 2016), available at <https://www.cbsnews.com/news/vermin-supreme-finishes-fourth-in-new-hampshire-democratic-primary/>.

[4]    *See* **Exhibit 4**, Megan Specia, "A man with a boot on his head got more primary votes than Jim Gilmore in New Hampshire," MASHABLE (Feb. 10, 2016), available at <https://mashable.com/2016/02/10/vermin-supreme-new-hampshire-primary/#zNrgewp6Ugqr>

The State of Kansas has made national news over the last few years regarding its voting laws.  On the one hand, Kansas has made national news for having uniquely restrictive laws when it comes to access to the ballot box: Defendant Secretary of State Kris Kobach has been the face of the Non-Citizen Voter Fraud Movement, which led to Kansas having some of the most restrictive requirements to vote in the country.[5]  Kobach's "Documentary Proof" law, which requires voters in Kansas to present documentary proof that they are a U.S. citizen to register to vote,[6] has received significant criticism.

On the other hand, the State of Kansas also made national news when the Kansas Elections Director Brian Caskey announced that Kansas has **no qualification requirements** when it comes to running for office in Kansas,[7] and several teenagers,[8] and several non-residents from Oregon,[9] Pennsylvania,[10] and

---

[5]   See **Exhibit 5**, Laurel Wamsley, "Kansas Scrambles To Change Rules After 6 Teens Enter Governor's Race," NATIONAL PUBLIC RADIO (Feb. 9, 2018), available at: <https://www.npr.org/sections/thetwo-way/2018/02/09/584678163/kansas-scrambles-to-change-rules-after-6-teens-enter-governors-race>.

[6]   A lawsuit regarding whether this law is Constitutional is currently pending before this Honorable Court:  *Fish v. Kobach*, No. 16-2105-JAR, U.S. Dist. Kan. (Filed 2016).

[7]   *See* Woodall, "The 16-Year-Old Running for Governor of Kansas," TRIBUNE NEWS SERVICE, *supra*.

[8]   *See* **Exhibit 6**, Eric Levitz, "6 Teenage Boys Are Running for Governor of Kansas," NEW YORK MAGAZINE (February 6, 2018), available at: <http://nymag.com/daily/intelligencer/2018/02/6-teenage-boys-are-running-for-governor-of-kansas.html>.

[9]   *See* **Exhibit 7**, Associated Press, "2 Men From Oregon Say They Plan to Run for Kansas Office," US NEWS (Feb. 23, 2018), available at: <https://www.usnews.com/news/best-states/oregon/articles/2018-02-23/2-men-from-oregon-say-they-plan-to-run-for-kansas-office>.

[10]   *See* **Exhibit 8**, Allison Kite, "7th teen candidate for governor has never lived in Kansas," THE TOPEKA-KANSAS JOURNAL (Feb. 15, 2-18), available at: <http://www.cjonline.com/news/20180215/7th-teen-candidate-for-governor-has-never-lived-in-kansas>.

---

New York[11] announced they would run for office in Kansas.  Mr. Supreme, who is actively engaged in politics and happens to be from Rockport, Massachusetts, followed the stories and originally announced he would run for Governor, but decided to run for Attorney General instead.  *See* Supreme Decl. at ¶¶ 1, 4-5.

Currently, law makers in Kansas are working to change the law in Kansas so that only residents who are over 25 may run in Kansas and only attorneys may run for Kansas AG, however, these changes to the law will not take effect until 2019, after the November Election Cycle.[12]  Mr. Supreme (who is not an attorney) believes the voters of Kansas will value having a non-attorney seek the office of Kansas AG.  *See* Supreme Decl. at ¶ 6.

Mr. Supreme filed his Declaration of Intention to run for Kansas AG timely, and in person, before June 1st.  *See* Supreme Decl. at ¶ 7.  Mr. Supreme also secured a rental property on May 17, 2018, with a rental reservation dates of "May 31st, 2018 to TBD".  *See* Supreme Decl. at ¶ 12.  Although the rent is nominal, Mr. Supreme has paid rent for the property.  *See* **Exhibit 11**; *see also* Supreme Decl. at ¶ 12.

Mr. Supreme asked Bryan Caskey, the Director of Elections at the Kansas Secretary of State's office, in person if there would be any issue if he listed both his Kansas rental property address and his Massachusetts address on the Declaration. *See* Supreme Decl. at ¶ 8.  Mr. Caskey assured Mr. Supreme that since there were no residency requirements, he could not foresee any issue arising if he listed both

---

[11]  *See* **Exhibit 9**, Courtney Ryan, "New York advertiser explains why he is running for Kansas governor," KSN WICHITA KANSAS LOCAL NEWS (May 9, 2018), attached as and available at: <https://www.ksn.com/news/capitol-bureau/new-york-advertiser-explains-why-he-is-running-for-kansas-governor/1169205961>.

[12]  *See* Kansas House Bill No. 2539, attached as **Exhibit 10**, which pursuant to Section 1, goes into effect January of 2019, and amends K.S.A. 25-205 to read that electors must be 25 years old every candidate for the office of attorney general must be licensed to practice law within the state of Kansas.

addresses.  *Id.* at ¶ 9.  Republican Executive Director Jim Joice filed an Opposition to Mr. Supreme's candidacy, citing that Mr. Supreme was not qualified because he was not a resident.  *See* Joice's Opposition, attached as **Exhibit 12**.

On Monday, June 11, 2018, the Kansas Elections Board held a hearing on Jim Joice's Opposition to Mr. Supreme's candidacy.  *See* Supreme Decl. at ¶ 11. The Board also held a hearing on the candidacy of another alleged non-resident, Michael Capps.  Mr. Supreme showed the Board that he had obtained a rental property in Kansas prior to filing his Declaration of Intent.   However, more importantly, Mr. Supreme argued that this was irrelevant, because the Kansas Constitution does not require candidates for public office to be residents.  Since the Kansas State Constitution[13] was ratified in 1859, two years before Kansas became a State,[14] the absence of a residency requirement, set in the context of the expanding west, cannot possibly be an omission.  However, this is precisely what the incumbent officials in Kansas have argued, without reference to textual meaning[15] or original intent, Kansas officials are systematically disqualifying certain candidates for office to narrow the playing field for themselves.

K.S.A. 25-308, as discussed in more detail below, states that the causes for objection to a candidate *may be* any one of a list of enumerated criteria.  The use of the permissive word "may be", while referencing a list of enumerated causes for objection, is certainly vague, and facially appears to mean that

---

[13]  *See* Constitution of the State of Kansas, attached as **Exhibit 13.**
[14]  Kansas became a State in 1861, *see* National Archives at: <https://www.archives.gov/legislative/features/kansas>, attached as **Exhibit 14**.
[15]  Further, enlarging the qualifications to run for office, beyond the plain words of the qualification clause of the Kansas Constitution, and without statutory authority to the contrary, is highly disfavored in the federal context: while this is merely persuasive authority, the Ninth Circuit has held that residency requirements that handicap nonresident candidates who would otherwise meet the requirements of the Qualification Clause, U.S. Const. art. I, § 2, cl. 2, to be unconstitutional.  *See Schaefer v. Townsend*, 215 F.3d 1031, 1032 (9th Cir. 2000).

people may object to a candidate for any reason, and Kansas officials may vote to get rid of or discriminate against any candidate for any reason, including political opponents.

Likely out of embarrassment of the recent news coverage and desperate to narrow the pool of candidates running for office, Kansas AG Derek Schmidt (who is up for re-election as the Attorney General) filed a lawsuit against Kobach (who is currently running for Governor as a Republican) seeking a declaration that only Kansas residents are eligible to run for Governor.  Kansas State Court Judge Watson, over the objection of ousted gubernatorial candidate and New York resident Andy Maskin (who argued, like Supreme, that the omission of a candidate residency requirement from the Kansas Constitution was likely deliberate, since leaders, especially in 1861, came from all over the nation)[16] declared that Maskins arguments were, "imaginative hypothesizing" and that declaring that there is a residency requirement for Governor is the, "common sense approach" and, "that the lack of an explicit candidate residency requirement was simply an oversight."  *See Kansas, ex rel. Schmidt v. Kobach*, Shawnee County District Court of Kansas, Case No. 2018-CV-285, Memorandum Decision and Order (Judge Watson) (May 31, 2018), attached as **Exhibit 15**.

The Kansas Elections Board, authorized by K.S.A. 25-308, cited to this declaratory judgment regarding the residency requirements for those running for

_____

[16]  Most of the founding fathers of Kansas were not originally from Kansas (Kansas was not a state at the time the founders drafted the Constitution); most were also distinguished journalists in their day, likely not known for blatant omissions: the President of the Kansas Constitutional Convention, James Winchell of New York, wrote for *The New York Times*; two other signatories: journalists Edmund G. Ross of Wisconsin and Victor Murdock of Illinois, both covered Kansas politics and worked as war correspondents.  *See* founders' biographies on the Kansas Historical Society Archives page, attached at **Exhibits 16, 17, & 18**, available at: <https://www.kshs.org/>.

RANDAZZA | LEGAL GROUP

*governor*, and voted against Mr. Supreme's candidacy, finding he was not a resident for purposes of being on the ballot as a candidate for Attorney General. However, directly after Mr. Supreme's hearing, the Board arbitrarily voted that another candidate, Michael Capps, who had also (1) only recently (May 5) moved, and (2) proclaimed to live in a house that was in foreclosure by a bank at the time of filing, was a resident for purposes of appearing on the ballot.[17]

The Kansas Elections Board has acted in bad faith, by seeking a declaratory judgment to narrow the field of candidates, and using the declaratory judgment to arbitrarily get rid of certain candidates that they claim do not meet the residency requirements (such as Mr. Supreme), but allowing other candidates, who objectively have the same "lack of residency criteria" to be named on the ballot. Both Capps and Supreme registered as Republicans, and in Kansas, the Republican nominee is chosen by *the voters* in a primary election held on August 7, 2018.[18]

For all of the following reasons, K.S.A. 25-308(a), (c), & (e) is unconstitutional on its face and as applied to Mr. Supreme. Further, the Kansas Elections Board has acted arbitrarily and capriciously, and has violated Mr. Supreme's free speech, free association, and due process rights, in violation of the First Amendment and Fourteenth Amendment of the U.S. Constitution and §§ 1, 2, 3, & 11 of the Kansas Constitution.

---

[17] *See* **Exhibit 19**, Chris Reeves, "Not all voter fraud is equal, as Kris Kobach provides two different standards in same meeting," DAILY KOS (June 12, 2018), available at <https://www.dailykos.com/stories/2018/6/12/1771350/-Not-all-voter-fraud-is-equal-as-Kris-Kobach-provides-two-different-standards-in-same-meeting>.

[18] *See* **Exhibit 20**, Office of the Kansas Secretary of State 2018 Election Information sheet, available at <https://www.kssos.org/elections/18elec/2018_Election_Information.pdf>.

**3.0   STANDARDS FOR OBTAINING INJUNCTIVE RELIEF**

In determining whether to issue preliminary injunctive relief, the moving party must establish: (1) a substantial likelihood of success on the merits; (2) a showing of irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Abilene Retail # 30, Inc. v. Six*, 641 F. Supp. 2d 1185, 1189 (D. Kan. 2009). If the movant prevails on the other factors, the Tenth Circuit uses, "a liberal standard for 'probability of success on the merits,' so the moving party need only raise questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id*. (internal quotations omitted), citing *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980).

When a violation of a constitutional right has been proven, however, no further showing of irreparable injury is required. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (internal citations omitted).

**4.0   ARGUMENT**

**4.1   Plaintiff Has Standing**

"To qualify as a party with standing to litigate, a person must show, first and foremost, an invasion of a legally protected interest that is concrete and particularized and actual or imminent." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). In the First Amendment context, a plaintiff has standing to sue if a challenged governmental action operates to "chill and deter" the plaintiff's exercise of his or her First and Fourteenth Amendment Rights. *See Doe v. Bolton*, 410 U.S. 179, 188 (1973).

The constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not "conjectural" or "hypothetical."  Second, there must be a causal connection between the injury and the conduct complained of, the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 557 (1992).

Here, Plaintiff's harm is readily apparent.  Defendants have disqualified Plaintiff from running for office in Kansas and have disqualified him from appearing on the ballot. Defendants' actions burden the Plaintiff's right to associate for the advancement of his political beliefs.  *See Anderson v. Celebrezze*, 460 U.S. 780, 787-88 (1983) ("[A]n election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens.")  Plaintiff's exclusion from the ballot deprives him of the opportunity to advance his positions on the issues of the day Kansas, especially since the issues of the day in Kansas appear to be voting rights and ballot-access, according to various national news sources, *supra*. Defendants have arbitrarily decided that the Plaintiff is not eligible to run for office in Kansas, without a qualification statute or qualification clause in the Constitution, yet feel free to decide that other similarly situated candidates are qualified.

The threat is imminent since the Plaintiff will not be allowed to appear on the ballot in the primary election, which is fast approaching. An order from this Court compelling Defendants to place Plaintiff on the ballot would vindicate Plaintiff, and allow Plaintiff the opportunity to express his positions in the marketplace of ideas.

### 4.2    Plaintiff is Likely to Prevail on the Merits of His Claims

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (quoting *Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979)).  "Access to the ballot and the ballot box is the necessary catalyst in the carefully calibrated system of individual freedoms and separation of powers crafted by our founding fathers.  Accordingly, we take great care to scrutinize any electoral regulation that would appear to restrict this access." *Utah Republican Party v. Cox*, 885 F.3d 1219, 1228 (10th Cir. 2018).

The concept of "liberty" assured by the Due Process Clause of the Fourteenth Amendment and § 1 of the Kansas Constitution embraces those rights and freedoms which are, "so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Palko v. Connecticut*, 302 U.S. 319, 325 (1937) (Cardozo, J.).  Among the most fundamental rights and freedoms are those that flow from the First Amendment, including freedom of speech, *Gitlow v. New York*, 268 U.S. 652, 666 (1925), and the freedom "to engage in association for the advancement of beliefs and ideas," *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) (Harlan, J.).  When interpreting the Kansas Constitution, Kansas Courts "customarily interpret its provisions to echo federal standards." *See Hodes & Nauser v. Schmidt*, 52 Kan. App. 2d 274, 288, 368 P.3d 667, 675 (2016) (internal citations omitted).

#### 4.2.1  K.S.A. 25-308(a), (c), and/or (e) are Unconstitutional and Defendants Have Violated Plaintiff's Constitutional Rights

K.S.A. 25-308(a) states that:

> Any certificate of nomination, nomination petitions or declaration of intention to become a candidate, filed or issued in apparent conformity with law, shall be deemed to be valid unless: (1) Objection thereto is made in writing within three days from the date

> the certificate, petitions or declaration is filed with or issued by the proper officers..."

K.S.A. 25-308(c) states that:

> In the case of nominations of national and state officers, objections shall be filed with the secretary of state and shall be considered by the lieutenant governor, secretary of state, and attorney general, and a decision of a majority of these officers shall be final.

K.S.A. 25-308(e) states that:

> The causes for objection under this section as to any office may be any of those causes listed in K.S.A. 25-1436.

K.S.A. 25-1436, referenced above, enumerates the following causes:

> Grounds for contest. Any contest of election to which K.S.A. 25-1435, and amendments thereto, applies shall be brought on any one or more of the following grounds:
>
> (a) The person to whom a certificate of election was issued was ineligible to hold such office at the time of the election;
>
> (b) some voters were deprived of the right of voting for a candidate or on a question submitted, when such voters had the right under the election laws of this state to vote thereon, and such deprival could change the result of the election;
>
> (c) illegal votes were received or legal votes were rejected which could change the result of the election;
>
> (d) error or fraud occurred in computing the results of the election which could change the result of the election;
>
> (e) the person to whom the certificate of election was issued offered or gave, or caused to be offered or given, a bribe to any person charged by law with any election duty, for the purpose of procuring such person's election; or
>
> (f) any other cause which shows that another was the person to whom the certificate of election for such office should have been issued.

First, none of the enumerated causes above fit Mr. Supreme's circumstance: (a) refers to eligibility **at the time of the election**, meaning that if Kansas did have a valid residency requirement (which it does not) then Mr. Supreme would have to be a resident by August 7, not June 1, so (a) could

not apply; (b) analyzes a situation where the voters were deprived of the right to vote for a candidate, and the Kansas Election Board apparently cares little about depriving the voters of the right to vote for Supreme; (c)-(f) are completely inapplicable since there is no issue or allegation here regarding illegal votes, fraud, bribes, or issuance to the wrong candidate.  Accordingly, none of the enumerated causes for objecting to a candidate are met here.  Thus, the Kansas Board of Elections has interpreted their power under K.S.A. 25-308(e) to mean that they *may* remove anyone from the ballot based on any objection for any reason. This statute, and this result, offends the Constitution.

The Statue on its face, in particular K.S.A. 25-308(e), appears to allow the Board to disqualify anyone they choose, since the word 'may" is permissive, and the Board apparently has not interpreted the inclusion of the enumerated list as a limit, since the Board has arbitrarily applied different standards to different candidates, and has not limited its causes to those enumerated.  So either the Board has not followed the statute, or the Board has interpreted the enumerated list as one that is merely permissive.

If the statute does in fact not any limits, then the statue is impermissibly vague under the Due Process Clause of the Fourteenth Amendment as well as overbroad under the First Amendment.  First, the language of the statute contains insufficient guidelines as to how anyone may be eligible to run for Attorney General in Kansas, which means the statue is vague.  *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its (guidelines) are not clearly defined.").  Next, the statute is overbroad because it "reaches a substantial amount constitutionally protected conduct" by giving government officials unfettered discretion to prohibit any candidate from running for office, in

violation of the candidates First Amendment free speech and free association rights. *See Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 491 (1982).

On its face, the statute is impossible to interpret, especially since it does not list a residency requirement in its enumerated subsection. This would mean that the Kansas Election Board can disqualify anyone for any reason it chooses, even if that reason is to disqualify a political opponent. As applied, the Kansas Election Board has already created different standards for different candidates. By extension, subsection (a), which highlights the process for objecting to a candidate, is also impossible to interpret and unconstitutional, because if an objector does not have to choose from an enumerated list, there is nothing to stop an objector from objecting to a candidate based merely on creating an uneven playing field and limiting voter choices.

Subsection (c), as discussed in more detail below, is unconstitutional on its face: it does not have a requirement that the AG designate a proxy, which means that the Attorney General, pursuant to the plain language of the statue, may either vote against a political opponent, or abstain, which would mean that candidates for the office of the Attorney General must gain unanimous support from the Board. Finally, as applied, the Defendants actions are unconstitutional, as they are empowered by the statute, and they have used their unfettered discretion to arbitrarily deny Plaintiff access to the Kansas Ballot.

### 4.2.2  Standard for Evaluating Constitutional Challenges to State Election Laws

The United States Supreme Court has outlined the court's function in evaluating a constitutional challenge to a State's election law. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by

the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

Under this test, the level of scrutiny varies on a sliding scale with the extent of the asserted injury.  At the low end of that scale, the law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of candidates. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (citing to *Anderson*, 460 U.S. at 788, 788-89 n.9).  When the state action places "severe" burdens on the rights of political parties, candidates or voters, the state action must be narrowly tailored to advance a state interest of compelling importance. *Id*. at 434 (citing to *Norman v. Reed*, 502 U.S. 279, 289 (1992)).

### 4.2.2.1    The Character and Magnitude of the Burdens

K.S.A 25-308 effectively empowers the Kansas Elections Board to get rid of any political adversary they choose for any reason.  Defendants' actions of arbitrarily deciding that Plaintiff was not a resident and thus not eligible to be on the ballot, despite the fact that there is no statutory or Kansas State Constitutional residency requirement,[19] and then immediately deciding that a similarly situated candidate was a resident and eligible to appear on the ballot burdens the Plaintiff's constitutional rights.  First, the Defendants' actions in arbitrarily restricting access to the ballot burdens the right of the Plaintiff to associate for the advancement of his political beliefs in Kansas, which would give Kansas voters

---

[19]  Further, the Board's reliance on Judge Watson's Declaratory judgment is in bad faith because, despite the poor reasoning of the judgment, the judgment specifically applies to candidates running for *governor*, not attorney general.

the right to cast their votes effectively. Freedom of association, "rank(s) among our most precious freedoms." *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). "[A]n election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens."

Here, the magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that Supreme seeks to vindicate is severe. The application of the relevant Kansas election law completely prohibits Supreme from appearing on the primary ballot to challenge the Kansas Attorney General, incumbent Attorney General Schmitt. The statute, not only authorizing, but requiring the Attorney General to serve on a three-person board with the power to disqualify political rivals from challenging him in open and fair elections serves no legitimate purpose. Political patronage is not a legitimate state interest. *See Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990) (political patronage can be a very effective impediment to the associational freedoms which are essential to a meaningful system of democracy).

As noted earlier, the Defendants' actions of excluding Plaintiff from the ballot deprives him of the opportunity to advance his positions on Kansas politics. The magnitude of these burdens could hardly be more severe. Here, government officials up for re-election, rather than Republican party primary voters, have selected the candidates they deem to be desirable to run against. Similarly, in *California Democratic Party v. Jones*, 530 U.S., 567, 569 (2000), the Supreme Court invalidated California's blanket primary on the ground that the, "statute would produce nominees and nominee positions other than those the parties would choose if left to their own devices." Here, the incumbent officials have arbitrarily decided to narrow the playing field of a primary election rather than let the Plaintiff appeal to the Republican primary voters, and allow the

voters to decide who will be the party candidate.  Given the Defendants' arbitrary basis for applying a residency requirement (a requirement that does not actually exist), the incumbent officials have unfettered discretion regarding who the competition on the ballot will be.

Plaintiff's constitutional rights were violated by Defendants' actions, specifically by telling Plaintiff he could not engage in constitutionally protected free speech by spreading his political message; and First Amendment associational activities by disqualifying Plaintiff from running for office in Kansas and from appearing on the ballot for the Republican primary election.  The statute, which empowers the Defendants to make arbitrary decisions about their political rivals, is accordingly unconstitutional on its face and as applied to Mr. Supreme.  The Plaintiff is unable to associate with the voters who would have supported his candidacy, which places a heavy burden on Plaintiff's First Amendment Rights.  Without an injunction, Plaintiff has no way of running for office or appearing on the ballot so that voters can effectively choose the candidate they prefer.

### 4.2.2.2    State Interests and Narrow Tailoring

The Defendants' actions impose heavy constitutional burdens, that must be narrowly tailored to advance a compelling state interest. Although it remains to be seen what interests, if any, the Defendants will identify to support their actions, the State cannot have any legitimate interest in giving a group of incumbents who are up for re-election an effective veto over who will appear on the primary ballot.

Here, the law is not sufficiently narrowed.  For example, the law could provide for a substitute state official to stand in the place of the Attorney General when ruling on the eligibility of candidates for Attorney General.  It could do the same for candidates running for Secretary of State or Lieutenant Governor.

Indeed, the Kansas statute demonstrates the ability to do just that.  Kansas Statute § 25-308 subsection (c) sets forth the procedures for considering objections to nominations.  The first sentence addresses challenges to nominations of national and state officers and provides that, "objections shall be filed with the secretary of state and shall be considered by the lieutenant governor, secretary of state, and attorney general, and a decision of a majority of these officers shall be final." However, "[i]n the case of nominations for county, township, city and school officers, objections shall be filed with the county election officer and shall be considered by the county election officer, county attorney or district attorney and **an elected official of the county whose position is not involved in the controversy**, who shall be designated by the county election officer. The decision of a majority of these officers shall be final."   Kan. Stat. 25-308(c) (emphasis added.). Abstention does not cure this defect for it significantly changes the percentage of votes required to overcome a challenge from 2 out of 3 (66 2/3%), to 2 out of 2 (100%).   Further, abstention is not mentioned in the statute, which means the statute, on its face, may allow a sitting Attorney General to remove political rivals. Regardless, even though the sitting Attorney General did not vote in Mr. Supreme's case, Mr. Supreme faced a greater challenge in convincing a two-member Board based on percentages alone.

Even if Kansas could claim a compelling interest in limiting who will appear on the ballot, the Defendants actions are not narrowly tailored to advance that interest.  Assuming *arguendo* that the newly discovered residency requirement is valid, the Defendants have not applied the "residency qualification" in a consistent manner, and have instead arbitrarily applied the qualification to certain candidates, such as Mr. Supreme, and not others.   Mr. Supreme has serious constitutional interests at stake and the Defendants have overstepped their bounds in claiming that there is a residency requirement for the Kansas

Attorney General when in fact there is not one, and applying this requirement to some candidates but not other similarly situated candidates.

Plaintiff's First Amendment free speech and free association rights were violated when the Defendants arbitrarily disqualified him from appearing on the primary ballot, and the Defendants violated his due process rights by acting in a manner that was arbitrary and capricious.  Procedural due process under the Fourteenth Amendment is meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property.  *Carey v. Piphus*, 435 U.S. 247, 248 (1978).  The constitutional guarantee of due process requires that a purpose of procedural due process is to convey to the individual a feeling that the government has dealt with him fairly, as well as to minimize the risk of mistaken deprivations of protected interests.  *Id.*  What is worse, is that the statute apparently endorses this result, since the Election Board Officials have apparently interpreted the statute to mean that the causes for objecting to a candidate need not be limited to the enumerated list, even though the statute specifically addresses the enumerated list.  Thus, the statute is vague or overbroad on its face, because it gives the Board unfettered discretion to rule any way they choose.  A law without guidelines is not due process. Additionally, the statute, as applied, violates the Plaintiff's constitutional rights.  This Court should therefore conclude that the Plaintiffs have a substantial likelihood of prevailing on the merits because the first factor weighs heavily in Plaintiff's favor.

### 4.3   Without Injunctive Relief, Mr. Supreme Will Continue to Suffer Irreparable Harm

As stated above, the Court must consider whether in the absence of injunctive relief Plaintiff would suffer irreparable injury, whether the balance of harms militates in favor of granting injunctive relief, and whether the public interest lies in favor of granting or withholding relief.  Here, Mr. Supreme fits all the

criteria.  As discussed above, he has a high probability of prevailing on the merits. It is well established that the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Free-speech restrictions and harms that touch upon the constitutional and statutory rights of candidates, as opined upon in *Elrod*, are generally not compensable by money damages and are therefore considered irreparable.  Thus, a likelihood of success on a First Amendment claim will likely satisfy all four preliminary injunction factors.  *Id.*

The treatment of political, voting, and ballot-access harms is of special importance and relates to the right to vote in the American democratic tradition:

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.  Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

*Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964); accord *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").  Here, the only voice that can be heard is that of the incumbent officials, not Mr. Supreme's or the Republican primary voters.  Money cannot fully compensate an individual for the loss of a right so fundamental.  Part of the reason is also practical: a court simply cannot undo—by means of a special election or otherwise—all of the effects of an invalid election.  Tremendous practical advantages accrue to those who win even invalid elections, and a court simply has no way to re-level the playing field.

Here, the irreparable nature of the denial of access to the primary ballot is apparent.  Without an injunction, Mr. Supreme will not be able to run in the Republican primary, and by extension, voters will not be able to cast an effective

vote in support of Mr. Supreme.  The primary election will be long over and the opportunity that the election presents for Mr. Supreme to run as a Republican candidate for AG will have passed.  Further, given that Kansas has passed new qualification requirements that will go into effect in 2019, and since it is highly unlikely that Mr. Supreme would be able to attend law school and pass the Kansas Bar exam before the next election cycle, Mr. Supreme's irreparable harm is exacerbated by the by the short duration of this once-in-a-lifetime event.

On balance, the harm militates in favor of granting injunctive relief because Mr. Supreme's fundamental rights, protected by the U.S. and Kansas Constitutions, are at stake.  This means that withholding injunctive relief will cause more harm to Mr. Supreme than granting injunctive relief will cause to Defendants because his fundamental rights will be denied.

The absence of an injunction would allow the Defendants to shut the Plaintiff out of the political process.  Defendants cannot claim any hardship, because the requested relief would simply require the Defendants to include Mr. Supreme on the Republican primary ballot.  Since Defendant's denial is unconstitutional, there is no harm in compelling them to place Mr. Supreme's name on the Kansas primary ballot.  The lack of damage that would occur if injunctive relief were granted obviously cannot compare with the irreparable harm Mr. Supreme suffers, because his constitutional rights are at stake.  Under these circumstances, the Plaintiff will suffer actual, imminent, and irreparable harm in the absence of preliminary relief.  Any inconvenience to the Defendants is far outweighed by the severe injury to Mr. Supreme should the preliminary relief not be granted.

Last, the public interest in this matter is best served by the protection of Mr. Supreme's constitutional rights.  *Id.*  The requested injunction will ensure that voters will have the opportunity to vote for the Republican candidate of their

choice in the Republican primary. Without the injunction, voters' choices will be arbitrarily limited. The public undoubtedly has a vital interest in a broad selection of candidates as well as the conduct of free, fair and constitutional elections. Our constitutional rights are our freedoms, reserved by the people; not rights granted to us. To deny Mr. Supreme his fundamental freedoms protected by the U.S. and Kansas Constitutions would not serve the public interest. The requested injunction, if granted, would therefore favor the public interest.

**5.0    CONCLUSION**

For the foregoing reasons, Mr. Supreme respectfully requests that the Court provide injunctive relief and compel Defendants to place Vermin Love Supreme's name on the Kansas Republican primary ballot.

Dated: June 22, 2018.                    Respectfully submitted,

/s/ David P. Calvert
David P. Calvert (#06628)
DAVID P. CALVERT, P.A.
532 N. Market St.
Wichita, KS 67214
(316) 269-9055
Fax: (316) 269-0440
lawdpc@swbell.net

Marc J. Randazza
 *Pro Hac Vice* forthcoming
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Tel: 702-420-2001
ecf@randazza.com